IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 27, 2019

## STATE OF TENNESSEE v. TROY JONES

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-3445    Mark J. Fishburn, Judge**

_____

### No. M2018-00200-CCA-R3-CD

_____

The Defendant-Appellant, Troy Jones, was convicted by a Davidson County jury of three counts of aggravated burglary and one count of sexual battery, for which he received an effective sentence of five years' imprisonment. See Tenn. Code Ann. §§ 39-14-403, 39-13-505. On appeal, the Defendant argues that (1) the trial court erred in allowing the State to introduce extrinsic evidence to impeach his statement to police, (2) the evidence is insufficient to support his convictions, and (3) the trial court improperly sentenced him. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Joshua L. Brand, Nashville, Tennessee, for the Defendant-Appellant, Troy Jones.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Janice A. Norman, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

On September 22, 2013, Miracle Holt was awakened by an intruder, who was "hovering" over her and "feeling on her buttocks." When she confronted the intruder, he ran and hid behind a bathroom door. Holt alerted other family members in the apartment and called her brother from a back room for help. Holt's brother, G. D'Angelo Mason, encountered the intruder inside the apartment and observed him stuffing an alarm clock in his pants. Mason ran back to his room, put on his shoes, and chased the intruder. Within minutes, Mason apprehended the Defendant and physically confronted him at a nearby basketball court. The Defendant denied being the intruder and claimed that he

had just retrieved an alarm clock from a friend and was returning to his dorm room at Fisk University. An investigation ensued, and the Defendant was subsequently indicted for the above charges.[1] The following proof was adduced during the April 17 through April 19, 2017 trial.

**Trial.** Miracle Holt lived with her mother, her sister, Prodeon Johnson, and her brother, G. D'Angelo Mason, in the Herman Street Apartments in Nashville, Tennessee. At trial, Holt narrated the layout of their small apartment through several photographs, which showed where she slept on the night of the offense, the bathroom, the bathroom hallway, the kitchen, and the living room area. On the night of the offense, Holt, her brother and his girlfriend, Holt's sister, their cousin, and two children were asleep in the apartment. Holt testified that she awoke to an intruder with a shoulder length, dreadlock hairstyle "hovering" over her and "feeling on" her buttocks. The intruder "grasp[ed] [her buttocks], trying to work his way around . . . under the covers . . . like a . . . sexual motion." She felt the intruder grab her buttocks at least twice. Holt said the intruder's face was close to hers. When she made eye contact with him, the intruder ran and hid behind the bathroom door. The bathroom light was on, and Holt was able to see "everything," including the intruder's face, hair, clothes, and weight. Once Holt realized she was not "dreaming," she woke up her sister and cousin, who initially thought she was joking. Holt then called her brother on the phone for him to come out of a back room in the apartment. Holt said that when her brother came out of the back room through the hallway, her sister threw a baby car seat at the intruder, and the intruder ran out the front door of the apartment.

Holt's brother and sister put on their shoes and ran after the intruder. Holt eventually caught up with them at a nearby basketball court, where they had confronted the Defendant. She recalled that upon being questioned about the intrusion, the Defendant said, "I was just going over to my friend's house to get an alarm clock to wake up in the morning." Holt said the Defendant pulled out an alarm clock, which she confirmed was the same alarm clock that had been taken from her apartment. During the confrontation, Holt's brother hit the Defendant with a spoon, and Holt struck the Defendant two or three times. Holt injured herself by hitting her head on the door on the night of the offense; however, she stressed it was not caused by the Defendant. Holt said her aunt's cell phone was also taken from the apartment, but she could not remember the exact description of the phone. She further explained that "a lady in the black car" apparently called the police, and Holt spoke to a detective about the incident. Holt identified the Defendant as the person who broke into her apartment at a hearing shortly

---

[1] The Defendant was also initially charged with theft of property valued under $500 and two counts of assault, all of which were dismissed prior to trial.

after the offense and at trial. Holt explained that the Defendant looked differently at trial because of "[t]he dreads, and his face was rougher."

On cross-examination, Holt acknowledged that she muttered, "What the F" upon seeing the Defendant in her bedroom. She denied having consumed any alcohol or illegal drugs on the night of the offense. She also did not observe her brother and sister throw a chair down the stairwell at the Defendant and did not observe the intruder leave the apartment with the alarm clock in his hands. Holt confirmed that she received a "cut" on her head, but she did not believe that the injury came from the intruder. She did not recall telling police officers or emergency responders that the intruder had injured her. The Defendant later called Detective Gilbert Mana to impeach Holt's testimony. Detective Mana testified, in relevant part, that on the night of the offense, Holt did in fact attribute her injury to the Defendant "punch[ing] her in the forehead."

G. D'Angelo Mason, Holt's brother, testified consistently with the testimony of Holt. On the night of the offense, Mason awoke to his phone ringing. He answered the phone, but he went back to sleep because there was no verbal response from the caller. After his phone rang again, Mason heard his sisters and cousin yell his name. He jumped up and stopped by the bathroom to investigate. He initially thought they were joking, until one of his sisters told him an intruder was in the apartment. As Mason turned around, his sister, Prodeon Johnson, screamed, "someone's behind you." Mason jumped back as the intruder walked in front of him. At that point, Mason was in the kitchen, which was close to the bathroom, and the intruder was approximately three or four feet in front of him. Mason explained that light was emanating from his and his mother's bedroom, so the apartment was "bright." He was able to see the intruder's face and described him as black, heavy set, a little over six feet tall, with a dreadlock hairstyle, wearing a striped shirt.

Mason testified that as the intruder was leaving, he observed the intruder "acting like he [was] on the phone, but [he was] stuffing something in his pants." Mason said he saw the intruder stuffing his sister's alarm clock into his pants. Mason was unable to describe the phone the intruder was using, but he said the intruder was not talking to anyone. At that point, Mason ran to his room, grabbed his shoes, and began to leave the apartment. Mason then observed the intruder "jingling on the bottom door to try to get into the next apartment." He said as he saw the intruder attempting to access another apartment at the bottom of the staircase, he picked up a chair and threw it toward the intruder. He recalled one of his sisters and his girlfriend being with him when the chair was thrown. Within two minutes of throwing the chair, Mason encountered the Defendant walking on the sidewalk.

- 3 -

At this point, Mason was alone with the Defendant and confronted him about entering his apartment and touching his sister. Mason testified that the Defendant said, "Man, I don't know what you're talking about, I wasn't in your house, I was coming from a friend's house to get an alarm clock." The Defendant continued to explain, "I [go] to Fisk University. I can show you my [identification] badge[,]" but Mason said he was never shown any such badge. Mason admitted that he was frustrated because he did not believe the Defendant, and he began to yell at him. Mason acknowledged that he punched the Defendant while still questioning him about being inside his apartment. Asked how he was so certain the Defendant was the intruder he had seen in his apartment, Mason testified, "I recognized his hair, his shirt and the clock[.]" Mason confirmed that from the time he discovered the intruder in his apartment to the time he confronted the Defendant on Herman Street, Mason had not spoken with his sister, Miracle Holt.

Mason testified that the Defendant had his sister's alarm clock in his hands when he encountered him on the street. Mason stood in front of the Defendant in an effort to give security guards time to respond and to prevent the Defendant from getting away. Mason explained that the confrontation eventually reached a nearby basketball court, which was close to Fisk University. Mason testified that the Defendant never hit him and continued to explain that he attended Fisk University and had just left campus to get an alarm clock from his friend's house. Eventually, Mason's sisters, his girlfriend, and his cousin arrived at the basketball court. His sister, Prodeon Johnson, brought his mother's antique spoon, and Mason struck the Defendant with it. Two security guards and the police later responded to the incident, and Mason briefly spoke with them. He identified the alarm clock, admitted as an exhibit at trial, as the same alarm clock taken from his apartment on the night of the offense.

On cross-examination, Mason confirmed that his mother was not present at the apartment on the night of the offense and that everyone who was at the apartment, except for his sister's child, went outside to the basketball court. Mason agreed that Holt also punched the Defendant while at the basketball court and that he did not see the intruder pick up anything in the living room of the apartment. He insisted, however, that he observed the intruder holding a cell phone up to his ear with his left hand. Mason specified that he encountered the intruder at the corner of Herman Street and 17th Avenue, walking towards the basketball court. Mason testified that there were several other houses and another apartment complex located between Herman Street Apartments and Fisk University. On redirect, Mason said that he knew the alarm clock the Defendant had was the same alarm clock taken from his apartment because it was no longer in their apartment where his sister had left it.

Prodeon Johnson testified consistently with the testimony of Holt and Mason. She was the last person to go to sleep on the night of the offense. Holt woke Johnson up and told her that an intruder was inside the apartment. Although Johnson did not initially believe Holt, Johnson later observed the intruder behind the bathroom door. Johnson said she was lying on the couch facing the bathroom, kitchen, and her sister's room, approximately fifteen to twenty feet away from the bathroom. She confirmed that the bathroom light was on and described the intruder as wearing a shirt and some pants. Although Johnson could not see the intruder's face, she said that the intruder's hair was in "dreads" and that he was holding something in his hands. When she saw the intruder, she threw her child's car seat at him. She went into her mother's room with Holt, her cousin, and her child, and called her brother. Johnson said the intruder was "speed walking" out of the bathroom, towards the living room, and out the front door.

As the intruder was leaving the apartment, Johnson saw him pick up something in the living room and stuff it into his pants. Johnson said she and Mason threw a chair down the stairs and began following the intruder to a parking lot at Fisk University. Johnson recalled taking her mother's golden, antique spoon with her. Johnson said she, Mason, and Holt next encountered "the guy that had left out the house" at "the big field right . . . behind Fisk University." When they confronted the intruder, he said, "he didn't touch nobody, he didn't rape nobody," and he was swinging her alarm clock by the cord. She identified the alarm clock at trial as the same alarm clock taken from her apartment on the night of the offense. Johnson said the intruder took the alarm clock from the table where the television was in the living room and that she had not given him permission to take the clock. Johnson sustained a black eye from the intruder swinging the alarm clock, which broke. Johnson said police officers eventually responded to the scene, that she spoke with a detective, and that she was never asked about the alarm clock. At trial, Johnson was unable to identify the intruder who broke into her apartment on the night of the offense.

On cross-examination, Johnson admitted that she was involved in a fight with the Defendant but did not recall hitting him with the spoon. Johnson said the fight ensued after the Defendant denied being in their apartment, touching Holt, and taking her alarm clock. Johnson testified that she did not take the spoon from the apartment to the basketball court and could not remember how the spoon got to the basketball court. Johnson also did not recall how the spoon broke and said she never saw the Defendant being hit with the spoon. Johnson did not remember Mason's girlfriend being present at the basketball court. Johnson admitted to a prior theft conviction; however, she explained that she "pled guilty for a charge for my friends." Johnson said that prior to the burglary, the alarm clock was sitting on a table in the living room unplugged from the wall because she was in the process of moving her belongings from her mother's apartment to her new home. The alarm clock had a green and white back that was broken

on the night of the offense; however, none of the broken pieces were recovered. On redirect examination, Johnson again said that the intruder she saw in her apartment was the same person she encountered later at the basketball court and that the alarm clock that that person had in his possession was hers. She again admitted to a prior theft conviction but said that her testimony at trial was truthful.

Detective Gilbert Mana of the Metro Nashville Police Department (MNPD) testified that in the early morning hours of September 22, 2013, he responded to a call at a basketball court near Herman Street. Initially, the call was reported as a fight in progress and later changed to a burglary. When he arrived at the scene, Detective Mana encountered several victims and the Defendant. After speaking with the individuals, Detective Mana learned of an incident that had occurred earlier at the Herman Street Apartments. Detective Mana described the victims' demeanor as "quite shocked and upset." He spoke with the Defendant, who claimed he had been "attacked by a group of males and females." Additional officers responded to the scene, and the crime scene unit was called to photograph the area. Upon canvassing the area, the crime scene unit recovered an alarm clock, which Detective Mana submitted to the police department's property room. Detective Mana identified the alarm clock, admitted as an exhibit at trial, and noted that the alarm cord was detached from the clock.

On cross-examination, Detective Mana confirmed that as the reporting officer, he completed an incident report, arrest report, and a property sheet for the instant offense. Detective Mana testified that other officers were already on the scene when he arrived, but he was responsible for changing the call from a fight in progress to a burglary. Detective Mana confirmed that he spoke with four victims on the night of the offense and that the information contained in his reports would have "been probably taken directly from the victims." He did not recall if the area was canvassed for any additional suspects. He confirmed that he was the only person who came in physical contact with the alarm clock, but he admitted that he did not attempt to collect any fingerprints from it.

On the night of the offense, Sergeant Jason Pierpoint with MNPD responded to the scene and was briefed by other officers. He determined that a "possible sexual assault had occurred during a possible burglary." Sergeant Pierpoint called Detective Ben Ward, a sex abuse detective, to report to the scene as well as additional crime scene officers to collect evidence. Officer Douglas Belcher, a crime scene investigator with MNPD, testified that he responded to a basketball court located near Herman Street, where he recovered several items including pieces of a plastic decorative spoon, pieces of an alarm clock, and a cell phone. Officer Belcher met with Sergeant Pierpoint and learned of an incident that had occurred earlier at one of the apartments in the Herman Street Apartment complex, which was nearby. Officer Belcher took photographs of the apartment and the basketball court and collected a cell phone from Detective Ward. He

testified that all other property was collected by patrol officers. Officer Belcher testified the he took three pieces of the decorative spoon and a cell phone from Detective Ward to the property room, all of which were identified at trial and admitted as exhibits. He said a cell phone and alarm clock found on the basketball court were turned over to Detective Mana.

On cross-examination, Officer Belcher confirmed that a cell phone was given to him by Detective Ward. To his knowledge, that cell phone had been in the police department's property room since the offense occurred. He said a second cell phone was collected from the basketball court and given to Detective Mana. Officer Belcher had no other contact with that phone. He said the cell phone found on the ground at the basketball court was believed to be the victim's phone. Officer Belcher confirmed that he generated a report of his investigation which provided, in relevant part, that the phone found on the ground was located in three pieces, photographed, and believed to belong to the Defendant. He explained that originally, that phone was believed to belong to the Defendant, but by the end of the investigation, officers believed the phone belonged to one of the victims. Officer Belcher said he never had any contact with the alarm clock, and he was not aware of any fingerprint analysis performed on it.

MNPD Detective Ben Ward responded to the scene based upon a report of an alleged sexual assault that occurred during a burglary of an apartment in the Herman Street Apartment complex. Upon arrival, Detective Ward spoke with Holt, Johnson, and Mason. The Defendant also agreed to talk to Detective Ward at his office, which was about five minutes away. Prior to talking to Detective Ward, the Defendant was given an advice of rights form, which advised him of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). The Defendant acknowledged that he understood his rights, signed the advice of rights form waiving said rights, and agreed to speak with Detective Ward. The advice of rights form was admitted as an exhibit at trial. The Defendant's statement to Detective Ward was audio and video recorded, the DVD of which was played for the jury and admitted into evidence. Although the jury was provided a transcript of the recording, the transcript was offered for identification purposes only. During the recorded statement, the Defendant stated, in relevant part, as follows:

DETECTIVE: Are you working anywhere?
DEFENDANT: No[,] I'm a full, I'm a student.
DETECTIVE: Full time student?
DEFENDANT: Yeah. Fisk University.

….

- 7 -

DETECTIVE: . . . I know some of the basics just from what they have told me, but I want to hear it from you [,] kind of how this all transpired.

DEFENDANT: I was coming back from walking by Burger King, because I had went to Burger king 'cause . . .

DETECTIVE: Down on Charlotte?

DEFENDANT: Down on Charlotte.

DETECTIVE: Okay.

DEFENDANT: So I was walking up from uh, walking up from Charlotte on 17th. As I crossed by Jackson, no Herman Street, as I crossed Herman Street and get to where my school is almost by my dorm I hear some people, well I don't hear people but I sort of you know how you just see people moving from you, the corner of your eye and everything. And then the next thing I know I started hearing some oh that's him, there he is, there he is, there he is. So I slowed down 'cause I'm thinking like alright if I run that's just gone make them chase after me. So I slowed down and when I slowed down they started walking up and they were already walking up in a threatening manner. They saying, um, they said, they was saying like "yeah that's him, that's him right there. That's you, what you was doing over there? What you was doing"? I'm like what are you guys talking about. Where, I'm trying to talk to them the whole time. Trying to talk to them and then they just started attacking me. They just started attacking me like, you can see I'm bruised up from that. I got a knot, I got uh, uh, bump on my noggin and . . . they're going back and forth with me and everything. Hitting me and saying that "oh you, you came in, you came in you came in here. . . . How did you get into our house?" I'm like what are you guys talking about I'm, I don't even know you guys. I go[] to Fisk University. I'm going back to my dorm. I'm going back to go to sleep. And then they was still kept messing with me . . . . But at that point, I was trying to get the security guard's attention . . . .

DETECTIVE: Okay. What did, what did you have on you at the time?

DEFENDANT: I had on me a, a clock and a cell phone.

DETECTIVE: Where did you get the clock from?

DEFENDANT: I had, had the clock the whole night.

DETECTIVE: So you took the clock to the Burger King?

DEFENDANT: No, I had … yeah I actually did take the clock to the Burger King but that was only because I couldn't put it down. I didn't go to my room. I went straight to Burger King.

. . . .

DETECTIVE: Where did you say you got the alarm clock?

DEFENDANT: I got the alarm clock from a friend earlier, well not earlier today but earlier tonight.

DETECTIVE: Okay. What's his name?

DEFENDANT: His name is Charles.

DETECTIVE:  Charles what?
DEFENDANT: Graham.

. . . .

DETECTIVE: You got a number for him?
DEFENDANT: Uh not on me, no.
DETECTIVE:  Was it in your cell phone?
DEFENDANT:  Uh, no it's not.  I, I don't even know if he has a phone right now.
To be honest.
DETECTIVE:  Where does he live at?
DEFENDANT:  He lives, uh, on Phillips.  I think 1506, 1504 or something.

. . . .

DETECTIVE: What time did you get it today?
DEFENDANT:  It probably, if that all happened around 2:00 it was probably like
10:00 or 11:00 or something like.
DETECTIVE:  Okay.  Did you call him up and say hey can I borrow your alarm
clock?
DEFENDANT:  Naw I just went over there.

. . . .

DETECTIVE: Can I see your ID?
DEFENDANT: I don't even have my student ID on me.  I really don't I'm sorry
as like.

. . . .

DETECTIVE:  Where is your student ID at?
DEFENDANT:  I left it in my dorm.
DETECTIVE: Okay.  And your dorm is what again?
DEFENDANT:  New Livingston Hall.
DETECTIVE: Livingston Hall?
DEFENDANT: Yeah.
DETECTIVE: Which one?  I mean which, uh, room number?
DEFENDANT:  326.

The Defendant told Detective Ward that he could find Charles Graham by contacting John Escoe.  During the video, the Defendant was given a cell phone to retrieve John Escoe's phone number.  Detective Ward attempted to call the number given for John Escoe, but he did not receive a response.  Detective Ward also attempted to follow up with Charles Graham at the address given, but he said the address was invalid.

He investigated nearby addresses, but he determined that those addresses were not associated with anyone by that name. Detective Ward testified that the cell phone that the Defendant used to retrieve John Escoe's phone number was given to Detective Mana. Following his discussion with the Defendant, Detective Ward also spoke to Holt's aunt regarding ownership of one of the cell phones found at the scene. He could not recall which phone belonged to which owner, but he believed that one phone was returned to Holt's aunt, and one was turned in to the police property room as belonging to the Defendant. Detective Ward did not recall if the cell phone turned in to the property room was in fact the cell phone found at the scene. Detective Ward identified the Defendant at trial as the person he encountered at the basketball court and subsequently interviewed on the night of the offense. Detective Ward confirmed that the Defendant's appearance at trial was "obviously a lot different" than his appearance during the recorded interview. On cross-examination, Detective Ward admitted that he did not request fingerprint analysis to be performed on the alarm clock recovered from the scene.

Stewart Watts, the Assistant Director of Residence Life and Campus Services at Fisk University, testified that he had access to the housing records of students at Fisk University. In response to a request from Detective Ward, Watts retrieved the housing records for the Defendant, which were admitted into evidence at trial. In the summer of 2008, the Defendant lived on campus for a precollege program. From August 2008 to July 2009, the Defendant also lived in New Livingston Hall and Shane Hall. However, Watts testified that there were no records of the Defendant living in student housing from July 2009 to 2013. On cross-examination, Watts acknowledged that he knew the Defendant and was his resident advisor in 2008 and 2009. Watts said two residents lived in Room 326 at New Livingston Hall during a summer program in 2013; however, he was not asked to bring the records for those residents.

In the fall of 2013, Dr. Gary Nash, a professor of music at Fisk University, taught a music theory course, and the Defendant was enrolled as a student. Dr. Nash testified that the Defendant previously had taken two prerequisite courses under his instruction. Dr. Nash recalled an incident that occurred in his class on or about September 10 or 11, 2013, involving the Defendant. Dr. Nash testified that the Defendant said "something that was inappropriate and unacceptable," and the Defendant walked out of class following a stern but professional reprimand. The Defendant never returned to any of Dr. Nash's classes. Dr. Nash identified the Defendant at trial, but he noted that the Defendant appeared "considerably different" than he did when he was enrolled in his class. On cross-examination, Dr. Nash said he issued the Defendant a letter grade of "E" for his fall 2013 course, which was more reflective of an incomplete than a withdrawal. Following the testimony of Dr. Nash, the State rested its case-in-chief.

The Defendant began his case by admitting his transcripts from Fisk University into evidence at trial. According to the transcript, the Defendant was enrolled at Fisk University from summer of 2008 to fall of 2013. In fall of 2013, he was enrolled exclusively in Dr. Nash's music theory class. The Defendant then recalled Detective Mana, who testified that on the night of the offense, Holt attributed her injury to the Defendant "punch[ing] her in the forehead." Detective Mana also observed Johnson with a bruised left eye, which Johnson explained happened when "she was punched . . . by the [D]efendant." Detective Mana testified that as the arresting officer, he was able to obtain statistical information regarding the Defendant and that according to the state database, the Defendant was 5'10" and 160 pounds. On cross-examination, Detective Mana confirmed that his conversations with the victims were not recorded, and the information contained in his report, which he used to refresh his recollection, came from conversations with all four victims. Detective Mana agreed that he did not personally measure the Defendant and that he had obtained the statistical information from information already collected in the state database. Detective Mana said he also observed injuries to the Defendant's hand on the night of the offense. Detective Mana confirmed that Detective Ward was also present at the scene.

Following the testimony of Detective Mana, the defense rested, and the State presented Detective Ward in its rebuttal proof. Detective Ward testified that on the night of the offense, he interviewed Holt in the front seat of his unmarked police car and that this interview was audio recorded. Detective Ward recalled the interview lasting approximately fifteen to thirty minutes. He testified that during the interview, Holt did not initiate statements regarding the injury to her forehead. Detective Ward also recalled interviewing Johnson at the scene and testified that Johnson did not initiate statements about her injury. Detective Ward said that Johnson "didn't think that [the injury] was done purposely[.]" Excerpts from Holt's interview were played for the jury. He testified that although Detective Mana was present at the scene, Detective Mana was not present when Detective Ward was speaking with the victims.

Following deliberation, the jury found the Defendant guilty as charged of three counts of aggravated burglary and one count of sexual battery. At the September 14 and November 6, 2017 sentencing hearings, the Defendant's presentence report, an addendum to the presentence report, and his psychosexual evaluation were admitted as exhibits without objection. The Defendant provided the following allocution,

> Since 2011 I've experienced a lot of changes, some external, some internal, all of them unwanted. I had a pretty rough time of things to say the least, however I'm not standing here in front of you to ask for pity or even empathy. I'm here to ask for a chance, a chance to pick up the broken

pieces of my life, reassemble them into a future I can step forward into. Thank you for listening and considering, Judge . . . .

Following arguments and consideration of the evidence presented, the trial court determined that the Defendant was not an appropriate candidate for alternative sentencing and sentenced him, as a Range I, standard offender, to five years on each count of aggravated burglary and two years for the sexual battery. The trial court merged the aggravated burglary charges and aligned the sentences concurrently, for a total effective sentence of five years' imprisonment. On November 8, 2017, the Defendant filed a motion for new trial, which was denied on January 18, 2018. The Defendant filed a timely notice of appeal and is now properly before this court.

## ANALYSIS

**I.** **Admissibility of Evidence Concerning the Defendant's Statement.** The Defendant contends that the trial court erred in allowing the State "to improperly demonstrate that [the Defendant] was dishonest in his denial of criminal activity by introducing extrinsic evidence that contradicted collateral matters referenced in statements on the evening" of the offense. The Defendant insists that his comments within his statement of denial to Detective Ward, claiming that he was a student at Fisk University and that he lived in a dorm on campus were tantamount to live witness testimony under Rule 803 of the Tennessee Rules of Evidence. As such, the Defendant argues that the State was barred from impeaching their own witness under the collateral fact rule because "introduction of such evidence tends to confuse the jury and uselessly to protract and increase the expense of judicial investigations." In response, the State contends that the trial court properly exercised its discretion in allowing the State to present direct, relevant evidence that the Defendant, contrary to his statements to the victims and the police, did not attend Fisk University or live on its campus at the time of the offense. We agree with the State.

Prior to trial, the Defendant filed a motion entitled, "MOTION IN LIMINE 7 (TO EXCLUDE IMPERMISSIBLE IMPEACHMENT AND CHARACTER EVIDENCE IN STATE'S CASE IN CHIEF)." On April 17, 2017, the trial court conducted a hearing to determine if the State would be permitted to impeach the Defendant's recorded interview within its case-in-chief. Defense counsel explained his position, in relevant part, as follows:

> Essentially what I'm asking is that the State not be allowed to impeach a video that they present as evidence. So what I understand the State to be doing in some regard is to say, we have a recorded statement from [the Defendant], it is in by and large him saying I didn't do this, I was never in

their apartment, that wasn't me. There are certain statements within that that they believe to be not entirely true in terms of where he was living at the time, maybe where he got the alarm clock, sort of tangential matters. And it's my position that . . . this might be hearsay because it's not necessarily a statement against interest, so I'm not even sure it gets in under the hearsay rule. If it does, the relevance of it is fairly minimal. And my concern is that the State is putting that forward for the sole value of saying "Look, he lied about these other things, so he must be lying about whether or not he was actually in the apartment on that night[.]" [T]he State can't sort of bring up on its own, one, either prior bad acts, . . . and I would consider these like impeachment kinds of things to be like prior bad acts . . . . [T]hey can't sort of preemptively impeach their own witness or call a witness for the sole purpose of impeaching it[.] . . .

So what I'm asking the Court is, if they are going to play his recorded statement, . . . in their case in chief, then that is essentially as far as they get, and they don't get to put on a bunch of other evidence to say – to impeach that statement. If [the Defendant] testifies, all bets are off, they can impeach all day long . . ., but if they are going to just play a statement and [the Defendant] chooses not to testify, then they don't get to introduce a whole bunch of extra evidence to show that he was lying during that statement.

In response, the State objected and reasoned as follows:

Judge, I feel as though a threshold issue to [defense counsel]'s argument is that the issues that the State is asking to put into evidence are not only in [the Defendant's] recorded statement. If the State chooses not to play his statement, the victims in this case will testify that [the Defendant] said "I wasn't in your apartment. I'm a Fisk student. I was just walking home," he's pointing to right there to where he's walking home, and he tells them that he got the alarm clock from his friend, that it's not theirs. That statement comes in regardless if we play his recorded statement with the detectives. . . . [W]hether or not [the Defendant] lived on Fisk Campus, as he told the victims he did, I think that that is relevant because of the proximity of where this happened. . . . Now, he goes on to give the detective a statement where he gives a specific address, and he did not live there. But before we even get to that statement, I submit to the Court that it's relevant evidence, it's not a tangential matter[.] . . .

- 13 -

At the conclusion of arguments, the trial court denied the motion in limine, reasoning, in pertinent part, as follows:

> [Rule] 803(1.2) does not require the statement of the party against whom it is intending to be used is a statement against interest[.] . . .
>
> So, I mean, you want to play his statement, you can play his statement. Then if you have evidence contrary to that that impeaches him, the rule specifically allows for that. It talks about irrespective theories clear that trustworthiness is not a separate requirement for its admission. I mean, it's if somebody says something, the other party can use it in whatever context they want to try and use it.
> . . . .
> I think the Rule allows them to do that, . . . it doesn't have to be inculpatory; they're allowed to introduce it regardless of its evidentiary value on its face to be utilized in any manner in which they believe it can be made relevant. Certainly[,] I think impeachment is one of those things, that his story to the police on this occasion could not have been true because we had this other evidence showing to the contrary, that's the way I read the rule.

Generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008). A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Id. (citing State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

The following evidentiary rules govern the resolution of this issue. Rule 607 of the Tennessee Rules of Evidence provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness. . . so long as the questioning is not a pretext for putting inadmissible hearsay before the jury." Tenn. R. Evid. 607; State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999) (internal citation omitted). As relevant here, Rule 803(1.2)(A) of the Tennessee Rules of Evidence operates as an exception to the rule against hearsay and allows for the admission into evidence of "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity." Tenn. R. Evid. 803(1.2)(A). Although Rule 803(1.2)(A) is titled, "Admission by Party-Opponent," the rule does not require that a statement be against interest as a condition for admissibility:

> Contrary to some common misconceptions, it does not matter that the statement was self-serving when made but turns out to be harmful by the

time of trial. Accordingly, the misleading term, "admission against interest," should be banned from ... appellate opinions. Under Rule 803(1.2)(A), it does not matter whether the declaration was self-serving when made.... If the opponent wants to use it, the statement comes in as evidence.

State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 8.06[3][a] at 8-47 to 8-48 (5th ed. 2005)). "Anything the opposing party said or wrote out of court is admissible in court against that party. Whether the statement was disserving or self-serving when made is immaterial." Id. (citing Donald F. Paine, Paine on Procedure: Admissions 'against interest', 43 Tenn. B. J. 32 (April 2007). A defendant's statements, both written and oral, are admissible, subject to exclusion only by other rules of evidence. Id. (citing State v. Binion, 947 S.W.2d 867, 874 (Tenn. Crim. App. 1996) and Neil P. Cohen et al., supra § 8.06[3][a], at 8-47).

Rule 806 of the Tennessee Rules of Evidence provides as follows:

When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

Tenn. R. Evid. 806. Tennessee Rule of Evidence 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, advisory comm'n notes).

As an initial matter, to the extent that the Defendant argues that the State was barred from introducing evidence that impeached the Defendant's video-recorded statement based on the collateral fact rule, we agree with the State, and conclude that this

issue is waived for failure to present it to the trial court. State v. Dobbins, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988) ("It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this Court."). In regard to whether the State was entitled to impeach its own witness, based on the above authority, we conclude the trial court properly admitted the Defendant's video-recorded statement under Rule 803(1.2)(A) of the Tennessee Rules of Evidence. We further conclude that the trial court properly determined that the State was not precluded from admitting additional evidence establishing the falsity of certain comments within the Defendant's statement in its case-in-chief. First, the Defendant's claim must fail because the victims in this case testified that upon being confronted with the burglary allegations, the Defendant denied being present in the apartment and instead explained his presence in the area as a Fisk student who was returning to his nearby dorm room. Because this was direct evidence that was material to the principal issue at trial, we fail to see, and the Defendant has failed to explain, how admission of this testimony was error.

Additionally, upon being further questioned by Detective Ward, the Defendant continued to deny any knowledge of the offense in his video-recorded statement. The Defendant provided specific details supporting his claim that he was innocently in the area only because he was a Fisk student who lived nearby in New Livingston Residence Hall Room 326. He further claimed that a friend named Charles Graham, who Detective Ward could reach only by contacting John Escoe, provided him with the alarm clock earlier that evening. In our view, the State, having the burden to prove these offenses beyond a reasonable doubt, was entitled to prove through direct evidence that the Defendant's statements to police that he was a student at Fisk University, that he lived in a nearby dorm, and that Charles Graham provided him with the alarm clock were false. Here, we are reminded that "a false statement made by a defendant in explanation of conduct which is the subject of criminal charges against him is admissible as tending to show consciousness of guilt." Nelson v. United States, 601 A.2d 582, 595-96 (D.C. 1991) (citing Fornah v. United States, 460 A.2d 556, 561 (D.C. 1983); Fox v. United States, 421 A.2d 9, 13 (D.C. 1980); Beck v. United States, 78 U.S. App. D.C. 10, 11, 140 F.2d 169, 170 (1943); Wilson v. United States, 162 U.S. 613, 620-21 (1896)). "The falsity of the exculpatory statements, which provides the inference of consciousness of guilt, typically is proven by independent direct evidence, not by defendant's subsequent admissions." Id. (quoting Fox, 421 A.2d at 13 (internal citation omitted)).

The State provided independent, direct evidence establishing the falsity of the Defendant's statements, enabling the jury to infer the Defendant's consciousness of guilt. In contrast to the Defendant's comments within his video recorded statement, the assistant director of residence life at Fisk University testified that the Defendant did not live on campus in New Livingston Residence Hall Room 326 at the time of the offense,

his music professor testified that the Defendant had effectively dropped out of his class in early September 2013, and Detective Ward testified that the address the Defendant gave him to reach John Escoe did not exist. This evidence was indeed probative of whether the Defendant was present in the victims' apartment at the time of the offense, and it cannot be said to have any tendency for the jury to have rested its decision on an improper basis or to have confused the jury in any way. Accordingly, the Defendant is not entitled to relief on this issue.

II. **Sufficiency of the Evidence.** Next, the Defendant argues that the evidence is insufficient to convict him of aggravated burglary and sexual battery. The Defendant does not dispute that the offenses were committed; instead, he argues that the State failed to establish his identity as the perpetrator of the offenses. In response, the State contends that the evidence was sufficient to support each of the Defendant's convictions. We agree with the State.

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by the appellate court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, an appellate court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)).

"The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The identification of the defendant as the perpetrator is a question of fact for the

jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)).

As charged in this case, aggravated burglary is the burglary of a habitation as defined in Tennessee Code Annotated sections 39-14-401 and 39-14-402. Tenn. Code Ann. § 39-14-403(a). A person commits burglary who, without the effective consent of the property owner, enters a building and commits or attempts to commit a felony, theft or assault. Tenn. Code Ann. § 39-14-402(a)(3). Habitation means any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons. Tenn. Code Ann. § 39-14-401(1)(a). Sexual battery is unlawful sexual contact with a victim by the defendant when the sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent. Tenn. Code Ann. § 39-13-505(a)(2).

The Defendant argues that the State failed to establish the Defendant's identity as the perpetrator of the offense because two of the three victims were unable to identify the Defendant as the perpetrator at trial. Additionally, the Defendant argues that Holt's identification of the Defendant at trial should be discredited because she was "significantly inconsistent in her descriptions of key events-casting great doubt on whether she was truly identifying the alleged assailant or simply pointing to the most likely candidate at counsel table." Viewing the evidence in the light most favorable to the State, on the night of the offense, an intruder entered the victims' apartment in the early morning hours and grabbed Holt on the buttocks while she was asleep. She awoke and verbally confronted the intruder, who then ran behind a bathroom door. At trial, Holt said the intruder's face was close to hers, and she made eye contact with him. She described the lighting conditions of the apartment, which enabled her to see "everything," including the intruder's face, hair, clothes, and weight. She specifically noted that the intruder had a dreadlock hairstyle at the time of the offense and that the Defendant's hair had changed at the time of trial. Nearly each witness who encountered the Defendant around the time of the offense testified that his appearance had changed at the time of trial. However, Holt was certain that the Defendant was the same man that had intruded into her apartment and grabbed her buttocks on the night of the offense.

Mason testified that within minutes of observing the intruder attempt to enter another apartment, he put on his shoes and ran after the intruder. While Mason and Johnson were unable to identify the Defendant as the perpetrator at trial, they were certain that the Defendant was the same man they had encountered on the night of the

- 18 -

offense at a nearby basketball court who was in possession of Johnson's alarm clock. Mason confronted the Defendant, who denied any knowledge of the burglary and claimed he was a Fisk student on his way back to his dorm. As previously discussed, subsequent investigation revealed the falsity of the Defendant's explanation for being in the area. Based on this evidence, any rational juror could have found the Defendant guilty of aggravated burglary and sexual assault. He is not entitled to relief on this issue.

**III. <u>Sentence.</u>** Finally, the Defendant argues that the trial court erred "in applying certain enhancement factors and increasing the [Defendant's] sentence beyond the minimum in the Range." The State argues that the trial court considered relevant factors and imposed a sentence consistent with the purposes and principles of the Sentencing Act. We agree with the State.

We review the length of a within-range sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. <u>State v. Bise</u>, 380 S.W.3d 682, 707-08 (Tenn. 2012). "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." <u>Id.</u> at 706. The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court. <u>State v. Carter</u>, 254 S.W.3d 335, 345 (Tenn. 2008). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." <u>Id.</u> at 344-45.

A trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b)(1)-(8). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). The court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. §§ 40-35-103(2), (4). As relevant here, aggravated burglary is a Class C felony and carries a penalty of three to six years' imprisonment for a Range I, standard offender. Tenn. Code Ann. §§ 39-14-403(b), 40-35-112(a)(3). Sexual battery is a Class E felony and carries a penalty of one to two years' imprisonment for a Range I, standard offender. Id. §§ 39-13-505(c), 40-35-112(a)(5).

In this appeal, the Defendant does not challenge any of the enhancement or mitigating factors applied by the trial court. Instead, he argues generally that the trial court failed to comply with the purposes and principles of the Sentencing Act because "the Appellant had no felony record and would potentially have been a candidate for probation if he did not have other pending charges." He additionally argues that "a low to mid-range sentence to serve would have served the ends of justice without diminishing the seriousness of the property offense, would have been the least restrictive means necessary to achieve these goals, and would have taken into account the appropriate sentencing principles." Our review of the record shows that the trial court engaged in an extensive review of the above sentencing law and principles prior to imposing the Defendant's effective five-year sentence. Accordingly, we conclude that the trial court properly imposed the sentence in this case. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing reasoning and analysis, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE